# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:06-CR-23-TS |
| | ) | |
| VERNELL BROWN | ) | |

## OPINION AND ORDER

This matter is before the Court on *pro se* Defendant Vernell Brown's request to withdraw his guilty plea, which he has presented to the Court through multiple filings and sworn statements. The submissions demanding this relief include a Notice of Mistake [DE 315], filed on June 26, 2008; Notice of Mistake [DE 328], filed on June 17, 2008; Notice of Mistake [DE 330], filed on June 24, 2008; and Verified Amended Defendant's Motion to Withdraw and Vacate Plea of Guilty and Plea Agreement in the Instant Case [DE 342], filed on July 24, 2008. Additionally, the Court held a hearing on July 11, 2008, to allow the Defendant to present evidence, testimony, and argument in support of his request to withdraw his guilty plea. Briefing, including a post hearing brief from the Government and from the Defendant, has been completed and the matter is ripe for the Court's decision.

## BACKGROUND

On May 24, 2006, the Government charged Vernell A. Brown, along with co-conspirators Marlyn J. Barnes, Michael D. Alexander, Theodis Armstead, Herbert Hightower, and Melvin B. Taylor, with conspiring to possess with intent to distribute more than five kilograms of a mixture or substance containing a detectable amount of cocaine. (Indictment, DE 53.) Barnes, Armstead, and Taylor were also charged with possessing a firearm in furtherance of

the alleged conspiracy. The charges were the result of an undercover drug sting in which a federal agent posed as a drug courier willing to help the Defendants rob a shipment of cocaine that the undercover agent was supposed to be transporting from Texas to a stash house in Fort Wayne. The Government's theory of the case was that the six Defendants came together in Fort Wayne to plan and carry out the robbery.

Defendants Hightower and Alexander were the first to enter guilty pleas. (Hightower Plea Agreement Dec. 6, 2006, DE 126; Alexander Plea Agreement Feb. 1, 2007, DE 141.) On September 18, 2007, the remaining four Codefendants proceeded to trial. On the second day of trial, before the introduction of evidence, the Defendants informed the Court that Barnes was willing to testify, if tried separately from the other Codefendants, that Taylor, Brown, and Armstead did not come to Fort Wayne to assist in the conspiracy alleged in the Indictment. After Barnes verified this in open court under oath, the Court granted a mistrial to give Armstead, Brown, and Taylor an opportunity to move to be tried separately from Barnes. After granting the motion to sever, the Court scheduled Barnes' trial, which would be followed by a second trial for the remaining Codefendants.

Defendant Barnes proceeded to trial, and a jury found him guilty of conspiracy and possessing a firearm in furtherance of the conspiracy. (Barnes Verdicts entered Feb. 7, 2008, DE 241.) Out of the remaining three Defendants who were to be tried jointly, two pleaded guilty shortly before their March 18 trial date. Armstead entered into a plea agreement with the Government on March 10, 2008 (DE 252), and Brown signed a plea agreement two days later, on March 12 (DE 256). One month after entering their pleas, Armstead and Brown testified for the Government at Taylor's trial. Hightower also testified, as he had during Barnes' trial. On

April 18, a jury returned guilty verdicts on both counts of the Indictment against Taylor, as well as on the forfeiture allegation.

More than two months after entering his plea of guilty, one month after testifying at Taylor's trial, and less than one week before his scheduled sentencing date, Brown filed a Notice of Mistake. He stated that he was withdrawing his plea and all prior testimony because he entered the guilty plea "under duress and feared life long imprisonment." (Notice of Mistake 2, DE 315.) He also stated that he no longer consented to his counsel's representation and wanted to move forward with his motion *pro se*.

Through a series of hearing, the Court found that Brown knowingly and intelligently waived his right to counsel, despite being advised of the heavy burden of persuasion he would bear to successfully withdraw his guilty plea. Toward this end, Brown has continued to argue that he entered his guilty plea "under duress and fear [of] life long imprisonment" (DE 328), and that he only signed the plea agreement and testified "under duress for fear of life long imprisonment" (DE 342 ). He also submits that he "never knowingly, willingly or intentionally subrograted [his] unalienable rights" or "created controversy," or "granted" the district court "jurisdiction" in this case (DE 330), and that the Court should "dismiss this cause of action with prejudice immediately for lack of jurisdiction" (DE 328). In his final reply brief, filed on September 23, Brown clarified that the basis for his belief that the Court has no jurisdiction is the fact that no actual drugs were involved in this case. (DE 381 at 9) (submitting that "[w]ithout an amount or type of drug provided by the government there would have never been 'Jurisdiction.' No case"). He also points to the lack of a "drug amount" as proof that his attorney should not have advised him to plead guilty. (DE 381 at 11, 12) (arguing that his attorney could not have

been looking out for his best interest by "coercing" him to enter a guilty plea "to a drug amount that doesn't exist" and a "crime that never occured [sic]").

The Government maintains that the Defendant has not presented a fair and just reason for withdrawing the plea, and that he should be sentenced in accordance with the terms of his plea agreement.

## LEGAL STANDARD

Federal Rule of Criminal Procedure 11 governs a defendant's request to withdraw a plea of guilty. It allows a defendant to withdraw a plea of guilty after the court accepts the plea and before sentence is imposed if "the defendant can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B). The Seventh Circuit has "frequently observed that a defendant does not have an absolute right to withdraw a plea before sentencing, although the court may allow him to do so if he has a fair and just reason for doing so." *United States v. Chavers*, 515 F.3d 722, 724 (7th Cir. 2008) (internal quotations omitted); *United States v. Hodges*, 259 F.3d 655, 661 (7th Cir. 2001). "Because the defendant's statements at a plea colloquy are presumed to be true, the defendant bears a heavy burden of persuasion in showing that such a fair and just reason exists." *Chavers*, 515 F.3d at 724 (citing *United States v. Logan*, 244 F.3d 553, 558 (7th Cir. 2001)). Requiring that the defendant have a "fair and just" reason to withdraw an accepted plea is consistent with the requirement that, before any plea is accepted, the defendant has sworn in open court that he actually committed the crimes, he has stated that he is pleading guilty because he is in fact guilty, he has stated that he is pleading guilty voluntarily, the court has advised him of his trial rights, the court has advised him of any

maximum possible penalty, the court has explained the terms of any plea agreement provision

waiving the right to appeal, and the court has found a factual basis for the plea. *See* Fed. R. Crim.

P. 11(b) (setting forth requirements for considering and accepting a guilty plea).

> Given the great care with which pleas are taken under . . . Rule 11, there is no reason to view pleas so taken as merely tentative, subject to withdrawal before sentence whenever the government cannot establish prejudice. Were withdrawal automatic in every case where the defendant decided to alter his tactics and present his theory of the case to the jury, the guilty plea would become a mere gesture, a temporary and meaningless formality reversible at the defendant's whim. In fact, however, a guilty plea is no such trifle, but a grave and solemn act, which is accepted only with care and discernment.

*United States v. Hyde*, 520 U.S. 670, 676–77 (1997) (quotation marks and brackets omitted)

(citing Advisory Committee explanation for adding "fair and just" language to Rule 32(e) (now

Rule 11(d)).


# ANALYSIS

## A.    Counsel's Advice Regarding Potential Penalties and Other Claims of Coercion

Coercion is a fair and just reason to withdraw a plea since a coerced plea is not voluntary.

*United States v. Gwiazdzinski*, 141 F.3d 784, 788 (7th Cir. 1998). "A guilty plea is voluntary

when it is not induced by threats or misrepresentations and the defendant is made aware of the

direct consequences of the plea." *United States v. Messino*, 55 F.3d 1241, 1248 (7th Cir. 1995).

One of the purposes of a Rule 11 colloquy is to expose coercion. To this end, the Court had the

following discussion with Brown during his March 14, 2008, plea hearing:

> THE COURT: Now, Mr. Brown, has anyone made any promise or assurance that is not in this plea agreement to persuade you to accept the terms of the agreement?
> THE DEFENDANT: No.
> THE COURT: Has anyone threatened you in any way to persuade you to accept

the terms of the plea agreement[?]
THE DEFENDANT: No.

(Plea Hr'g 7.) After discussing specific terms of the plea agreement, the Court again asked:

THE COURT: Let me ask you, has anyone attempted in any way to force you to plead guilty in this case, or has otherwise attempted to threaten you?
THE DEFENDANT: No, ma'am.
THE COURT: Has anyone made any promises of any kind to get you to plead guilty other than what's contained in the plea agreement?
THE DEFENDANT: No.
THE COURT: Are you pleading guilty of your own free will?
THE DEFENDANT: Yes.

(Plea Hr'g 13–14.) As is true with other statements made during a plea colloquy, a "defendant's declaration in open court that his plea is not the product of threats or coercion carries a strong presumption of veracity." *United States v. Darling*, 766 F.2d 1095, 1101 (7th Cir. 1985).

The Defendant does not point to any deficiency in the Court's Rule 11 colloquy where he was placed under oath and personally addressed in open court. That is, he does not allege that the Court failed to follow any of Rule 11's provisions. Nor does he submit that any of his comments during the hearing suggested that his plea was anything other than knowing and voluntary. Although he points out that there was some confusion at the beginning of the hearing regarding the pagination of the plea agreement, he does not indicate how this amounted to "coercion" to plead guilty. Before engaging in any discussion with the Defendant about the terms of his plea agreement, the Court verified that all parties had the same plea agreement.[1]

Against the statements the Defendant made at the plea colloquy that no one forced him to plead guilty are his claims, made two months after his plea colloquy statements, that he entered

---

[1] Of course it is understandable, as the Government explained in its brief, that a document drafted using one computer's software and sent electronically to another party's computer and downloaded using different word processing software might slightly alter page formation and fonts while not affecting the substance of the document.

the plea under duress. One of the factors that caused the duress the Plaintiff complains of is that his attorney told him that if he did not enter a plea of guilty, he would be facing a lot of time. (July 11, 2008, Hr'g Tr. 32–33.) The Defendant believes that his counsel's advise that he was facing a maximum life imprisonment was erroneous and that it clouded his judgment. (July 11, 2008, Plea Hr'g Tr. 39–40.) But it is the Defendant who is wrong; life imprisonment is the maximum penalty authorized by statute for the Defendant's offense.

The Indictment charges the Defendant with conspiring with others to possess with intent to distribute more than five kilograms of cocaine in violation of 21 U.S.C. § 846. This section of the criminal code provides that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 21 U.S.C. § 846. The object of the conspiracy charged in this matter was possession of more than five kilograms of cocaine, which is governed by 21 U.S.C. § 841. Under § 841, a person who commits an offense involving five kilograms or more of cocaine "shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life." 21 U.S.C. § 841(b)(1)(A)(ii). However, under § 841(a)(1)(A), a prior felony drug conviction raises the mandatory minimum sentence to 20 years in prison. *Id.* ("If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 20 years and not more than life imprisonment."). These penalties were listed in the Notice of Penalties filed by the Government on May 5, 2006, before the Defendant's initial appearance and arraignment. On September 11, 2007, the Government filed an Information Pursuant to 21 U.S.C. § 851(a)(1), informing Brown

that it intended to use his prior Michigan state conviction for possession of a narcotic controlled substance to seek an enhanced sentence. (DE 194). Thus, a conviction on the Indictment would require the Court to sentence the Defendant to at least 20 years imprisonment and authorize a maximum penalty of life imprisonment.

Although the Indictment charged the Defendant with conspiring to possess more than 5 kilograms of cocaine, the Defendant's plea agreement contained a stipulation for a lower drug amount—between 2 and 3.5 kilograms. (Plea Agr. ¶ 7(d), DE 256.) The statutory penalty for this quantity of cocaine is 5 to 40 years if the person does not have a prior felony drug offense. 21 U.S.C. § 841(b)(1)(B)(ii). This penalty increases to 10 years to life imprisonment if the person has a prior final drug conviction. *Id.* This consequence of the Defendant's plea was set forth in paragraph 7(b) of the plea agreement and reiterated by the Court during the plea hearing. (DE 256 ¶ 7(b); Plea Hr'g Tr. 14–15.) Both the plea agreement and the Court specifically advised the Defendant that he was subject to the increased penalty because he has a final prior conviction for a felony drug offense and the Government filed a notice pursuant to 21 U.S.C. § 851. (DE 256, ¶ 7(b); Plea Hr'g Tr. 15.) The Defendant confirmed that he did not have any questions about the potential term of imprisonment, but expressed confusion about the difference between supervised release and ordinary parole, which the Court then explained. (Plea Hr'g Tr. 15.) The Court also confirmed the Defendant's understanding that his sentence would be determined using a combination of the advisory guidelines, possible authorized variances from the guidelines, and other statutory sentencing factors. (Plea Hr'g Tr. 16.)

The Defendant's argument that he was coerced to plead guilty because he feared life long imprisonment does not provide a fair and just reason to withdraw his plea. First, the Defendant

cannot establish that he received erroneous advise, much less that such advice rendered his plea involuntary. Because his counsel's advise was correct, his performance was not objectively unreasonable, thereby foreclosing any claim that counsel's ineffectiveness rendered his plea involuntary. *Cf. United States v. Martinez*, 169 F.3d 1049, 1053 (7th Cir. 1999) (stating that a counsel's prediction regarding his client's sentence that is a "gross mischaracterization" may demonstrate objective unreasonableness of counsel's performance). Even when counsel's advise is *incorrect*, it does not render a plea involuntary where a defendant states during a plea colloquy that he understands the consequences of his plea. *See, e.g., Bridgeman v. United States*, 229 F.3d 589, 592 (7th Cir. 2000); *United States v. Santos*, 189 F. App'x 534, 537 (7th Cir. 2006) ("Santos acknowledged throughout the colloquy that he understood the consequences of pleading guilty; thus his attorney's prediction that he would be sentenced to a longer term if he went to trial does not render his plea unknowing or involuntary."). Second, and just as important, his argument is belied by his own statements under oath that he was voluntarily pleading guilty. The Court is entitled to give these statements "great weight." *United States v. Walker*, 447 F.3d 999, 1004–05 (7th Cir. 2006) ("The only rational manner in which a judge may determine whether a plea is knowingly and voluntarily made, is to observe the defendant's demeanor and responses to the court's questions and to rely on the defendant's sworn answers.") (quoting *United States v. Ellison*, 835 F.2d 687, 693 (7th Cir. 1987)). Third, even after he received the benefit of a lessened drug quantity through a stipulation with the Government, the Defendant remained exposed to a maximum potential penalty of life imprisonment. He acknowledged this fact during the change of plea hearing. Thus, if the Defendant honestly believed that his counsel was mistaken about the potential penalties and that this advise was a decisive factor in his

decision to plead guilty, he would have expressed hesitation over the reference to life imprisonment during the plea colloquy, just as he did when he was confused about the difference between supervised release and parole.

Another argument that the Defendant presents in support of his claims that his plea was coerced is that he did not ask his attorney to bring him a plea agreement, but that his attorney did it anyway. He also contends that he was rushed to sign the plea agreement on March 12 and enter the plea on March 14 because his March 18 trial was looming. (July 11, 2008, Hr'g Tr. 32–33.) The Defendant does not indicate how the fact that a plea was presented to him, even if he did not ask for it, overcame his free will to enter the agreement and to plead guilty. His counsel was obligated to present to the Defendant any plea offer from the Government. The Defendant was free to weigh his options and decline to accept the plea. The Defendant affirmed under oath that he had an opportunity to read and discuss the written plea agreement with his lawyer before he signed it. (Plea Hr'g Tr. 6–7.) The Defendant contradicted this statement at the July 11 evidentiary hearing by stating that he was rushed to sign it without reading it "thoroughly through," and that his attorney only "briefed over it." (July 11, 2008, Hr. Tr. 35–37.) The Court does not credit these vague and shifting statements, which have no corroboration, contradict those statements the Defendant gave during the change of plea hearing, and were only made after the Court specifically questioned the Defendant on this point. Instead, the Court holds the Defendant to his admission during the plea colloquy. The Court also presumes that the Defendant was "fully satisfied with" his counsel's representation "and the advice" his counsel gave him, as that is what he confirmed during the plea hearing. (Plea Hr'g Tr. 6.)

Neither does the fact that his trial date was five days away convince the Court that the

Defendant could not exercise his free will. The Court finds support in *United States v. Lundy*, where the defendant argued "that the general atmosphere in which he agreed to plead guilty—an eleventh hour meeting with his attorney as the clock ticked down to trial—was conducive to coercion." 484 F.3d 480, 484 (7th Cir. 2007). The defendant emphasized that he had continuously expressed his desire to go to trial and his attorney only began pushing him to plea at the last minute. *Id.* The Seventh Circuit held that the district court properly found that the timing of the plea did not provide a reason for withdrawing it in light of the defendant's acknowledgment of the terms of the plea agreement. *Id.* ("That the agreement was made close to trial is irrelevant so long as [the defendant] understood it and voluntarily entered into it.").

The Court is also guided by *United States v. Milquette*, 214 F.3d 859 (7th Cir. 2000), where the defendant argued that the court should have allowed him to withdraw his plea because he was "in a state of panic" when he learned on the day his trial was to begin that all his codefendants were going to testify against him even though he was actually innocent, and that this information "clouded his judgment" and "overwhelmed" him. 214 F.3d at 861. The court concluded that the defendant was not in a state of panic, but was thinking clearly at the time of the plea. It arrived at this conclusion using its recollection of the defendant's demeanor during the change of plea hearing and the fact that the defendant contested certain facts at the hearing and provided specific information about the conspiracy. *Milquette*, 214 F.3d at 862. The same is true of this Defendant. There is no indication that he was under duress or somehow panicked about his decision. Quite the opposite; he was responsive and attentive during the plea colloquy, at one point noting an item for clarification. He pointed to his specific involvement in the conspiracy, as well as the involvement of others. This is the same information he testified about

one month later during the trial of Codefendant Taylor. At no time did his demeanor or appearance suggest that he was so distraught that he could not make voluntary decisions about his case. The Court makes this determination after observing the Defendant's demeanor in open court on numerous occasions, both when he was represented by counsel and after he waived his right to counsel. The Defendant's ability to freely make his own decisions about the matters pertaining to his case has been apparent to this Court on each occasion that it has observed him.

The Defendant claims that adding to his pressure to plead was his counsel's statement that he would be out of prison while he was still young if he entered a guilty plea. Given the terms in the plea agreement, this was a reasonable statement. It is not only proper for an attorney to make an assessment of his client's case, including the potential outcome of a trial and to advise that he should take a plea, but it is his professional responsibility. *See Messino*, 55 F.3d 1241, 1251–52 (7th Cir. 1995) (stating that it was not coercive for counsel to tell his client that he would most likely be convicted if he went to trial and that a plea was in his best interest).

> If we were to hold that urging a client who is facing an overwhelming amount of evidence of guilt against him to consider entering into a plea agreement is coercive, then we would make it impossible for defense attorneys to properly fulfull their professional responsibilities of advising their clients and would serve to encourage wasting court time and government resources on trials wherein the outcome is almost a foregone conclusion.

*Messino,* 55 F.3d at 1252. One of Brown's Codefendants had already been convicted after a jury trial. Three others had entered plea agreements that included provisions requiring their testimony at any trial at which they were called as witnesses. This would have included the trial of Brown if he persisted in his plea of not guilty and exercised his right to a jury trial. Thus, the circumstances under which Brown pleaded guilty were vastly different than they were six months earlier when Brown and three of his Codefendants began a trial that ended in a mistrial.

Contrary to Brown's assertions, his willingness to go to trial in September 2007 is not persuasive evidence that he involuntarily pleaded guilty in March 2008, after a third Defendant pleaded guilty and agreed to testify and another Defendant was convicted by a jury. It is the Defendant's own statements to the Court during his guilty plea hearing that he was not coerced or threatened in any way to plead guilty that are compelling.

The Court finds that the Defendant entered the plea as a calculated action intended to lessen his exposure, rather than as a rash and uninformed decision. The plea had the effect of lowering the mandatory minimum from 20 years to 10 years by stipulating to a reduced drug quantity. In addition, the agreement set forth the possibility that the Government would file a motion for his substantial assistance, which would have the effect of allowing the Court to sentence the Defendant below the mandatory minimum of 10 years if he truthfully testified at any trial to which he was called as a witness by the Government. (Plea Agreement ¶¶ 7(c)(ii) & 7(e), DE 256.) This finding is further bolstered by the Defendant's own thoughts, put to paper in a letter he wrote to Taylor explaining his decision to plead guilty: "listen bro this is better judgement, minimal 20 years for me 1% chance to win i'll be a dame fool to go over there if dude said I did it it and herbi saying I did it. 20 yrs v.s 5 years bro will be out 32 instead of 47." ( Gov't Resp. Ex. 1, DE 361-2) ([sic] references omitted).[2]

In review of all of the circumstances of this case, including the demeanor of the Defendant during his plea colloquy and during the evidentiary hearing on his motion to

_____

[2] The Defendant does not dispute that he wrote this letter. In fact, he attaches it to his reply but does not address the portion of the letter highlighted in the Government's response brief. Instead, he points to the letter as evidence of coercion, arguing that it shows that the his lawyer and Armstead's lawyer relayed messages from the Government about what the Government's course of action would be if he and Armstead went to trial. Even if the letter was proper evidence of what the Government actually intended to do, it does not point to any improper retaliation or coercive tactics.

withdraw, the Court finds that the Defendant's statements regarding coercion do not overcome the presumption of veracity that attaches to his plea colloquy statements. The Court credits the Defendant's statements from March 14, 2008, over his later claims. The Court also concludes that the Defendant has not pointed to any false or coercive statements by his counsel.

**B.** **Claims Regarding Merits of the Drug Charges—Ineffective Assistance of Counsel and Actual Innocence**

A significant portion of the Defendant's reply is dedicated to arguing that the Court does not have jurisdiction of this case because there was no actual crime, and thus any advice to plead guilty was faulty and amounted to coercion. This argument combines elements of ineffective assistance of counsel with actual innocence claims. Ineffective assistance of counsel renders a guilty plea involuntary. *United States v. Carroll*, 412 F.3d 787, 793 (7th Cir. 2005). To show ineffective assistance, the Defendant must show that his counsel's performance was "objectively unreasonable" and that, but for his counsel's errors, he would not have pleaded guilty. *Id.* (citing *Hays v. United States*, 397 F.3d 564, 568 (7th Cir. 2005)). "Actual innocence is a ground for withdrawing a guilty plea," but only if the defendant produces "some credible evidence of his innocence." *United States v. Chavers*, 515 F.3d 722, 725 (7th Cir. 2008).

To prevail on either of these theories, the Defendant must be correct in his arguments that actual drugs were required to charge the Defendants with conspiracy, and that there was no evidence of a drug type or amount. The Defendant's argument appears to be based on the faulty premise that the grand jury could not indict persons for conspiring to possess with intent to distribute controlled substances unless actual physical drugs were recovered. This is wrong. To prove a conspiracy under 21 U.S.C. § 846, the government must prove that (1) two or more

people agreed to commit an unlawful act; and (2) the defendant knowingly and intentionally joined in the agreement. *United States v. Emerson*, 501 F.3d 804, 811 (7th Cir. 2007); *see also United States v. Caraway*, 108 F.3d 745, 750 (7th Cir. 1997 ) (stating that for purposes of 21 U.S.C. § 846, a conspiracy is a confederation or two or more people formed for the purpose of committing, by their joint efforts, a criminal act prohibited by the Controlled Substances Act). The Government's theory of this case is that the Defendant joined in an agreement with the Codefendants to commit the unlawful act of possessing cocaine with the intent to distribute it. The Defendants planned to get possession of the drugs by stealing a shipment of cocaine that they believed was being delivered to Fort Wayne.

*United States v. Emerson* involved a factual scenario very similar to this case. A federal agent, posing as a dealer for a cocaine trafficker, met with individuals who planned to steal a (fictitious) shipment of cocaine that the agent was supposed to be receiving from his boss. *Id.* at 809. After the plan was in place, the agent led the conspirators to a storage facility where they were arrested. *Id.* at 810. The defendants were convicted of the same charge facing the Defendants in this case: conspiring to possess with intent to distribute cocaine in violation of § 846.

The Defendant admitted the essential elements of a § 846 conspiracy during his plea colloquy.

> THE COURT: Would you tell me in your own words, Mr. Brown, what you did in relation to the charge against you in Count One of the Indictment.
> THE DEFENDANT: I was -- I conspired with two other individuals, Marlyn -- no, um, Melvin and Theodis Armstead to come to Fort Wayne to follow the conspiracy.
> THE COURT: What was the conspiracy; what were you all planning to do?
> THE DEFENDANT: To jack a load of cocaine.
> THE COURT: And you knew what you -- you knew that the load that you were

intending to take was cocaine?
THE DEFENDANT: Yes.

(Plea Hr'g Tr. 22.) The Defendant admitted to participating in a meeting at a hotel in Fort Wayne to "talk about the planning of this conspiracy" with "Marlyn Barnes, Theodis Armstead, Melvin Taylor, Herbert Hightower, [and] Michael Alexander." (Plea Hr'g Tr. 23.) He stated that the morning after the meeting, "we had went to in a vehicle to go to this place to follow the conspiracy and to rip off this load of drugs." (Plea Hr'g Tr. 23.) The Government explained during its presentation of evidence that during the hotel meeting Brown asked what kind of guns the people at the stash house had and whether they would be "posted up," and that he requested duct tape and gloves. (Plea Hr'g Tr. 26, 27.) The Government also stated that, according to Codefendant Hightower, after the undercover agent left the hotel room, Brown and Armstead planned to carjack the undercover agent as he took two to three kilos of the cocaine to Youngstown, Ohio. (Plea Hr'g Tr. 31.) The Government stated that Codefendant Armstead verified that he talked to Brown about getting the two kilos of cocaine headed for Ohio. (Plea Hr'g Tr. 31.) After this presentation of evidence the Court inquired, and the Defendant responded, as follows:

> THE COURT: Do you agree with the Government's summary of what you did?
> THE DEFENDANT: Yes.
> THE COURT: Is there anything with which you disagree?
> THE DEFENDANT: No, ma'am.
> THE COURT: Then at this time, Mr. Brown, let me ask you, how do you wish to plead as to Count One of the Indictment in this case, charging you with violations of Title 21 of the United States Code Section 846 for conspiracy to possess with the intent to distribute Schedule II controlled substance, that being cocaine, guilty or not guilty?
> THE DEFENDANT: Guilty.

(Plea Hr'g Tr. 32.)

16

Consistent with the Government's presentation during the plea hearing, at Codefendant Taylor's trial, Brown testified that he came to Fort Wayne to rip off a load of drugs that he assumed was cocaine. (Melvin Taylor Trial Tr. 27, 28.) He testified about the meeting at the hotel room, his question about the people at the stash house being posted up, and his request for gloves and duct tape. (*Id.* 41–43, 45.) He testified that he learned that two kilos of cocaine were going to Ohio and that after the undercover agent left the room, he and Armstead planned to take it. (*Id.* 44–45, 60.) Brown said that when the undercover agent met them the next morning he said he had the two kilos with him that he was going to take to Ohio. (*Id.* 49, 57.) Brown stated that he intended to sell his share of the stolen drugs to get money. (*Id.* 48.)

Throughout the trials of both Marlyn Barnes and Melvin Taylor, the Government presented ample evidence of the quantity of cocaine involved in the conspiracy. This was based on their understanding of the number of kilos of cocaine that was being shipped to Fort Wayne—enough cocaine to split among the six Codefendants and the undercover agent. This evidence supports the Indictment charges and Brown's attorney cannot be faulted for not pursuing a defense—that the type and quantity of drugs involved in the conspiracy could not be proven and that the court had no jurisdiction because no actual drugs were involved—that has no merit. The Defendant's argument that there was "no actual crime" (De 381 at 9) is contradicted by his sworn testimony at the plea colloquy and at the trial of Codefendant Taylor. It is also contradicted by the other evidence presented at the trials of both Barnes and Taylor. The claim is patently without merit and does not provide a fair and just reason to withdraw the guilty plea.

**C.      Motion to Produce**

The Court must also address a Motion to Produce Transcripts/Also Produce the Order That was Given to Remove Exhibit C From Docket 338 [DE 359] that the Defendant filed on August 22, 2008. In this Motion, the Defendant requests copies of transcripts from six different proceedings. Among the transcripts he requests are those from a probable cause hearing held on May 17, 2006, the grand jury's proceedings, a suppression hearing held on June 11, 2007, and the mistrial of the Defendant and three Codefendants on September 18 and 19, 2007. In his Motoin, the Defendant does not indicate why he believes these transcripts are necessary to decide whether he has provided a fair and just reason to withdraw his guilty plea. However, it appears from the Defendant's reply that he believes these proceedings support his argument that no crime was committed, that the grand jury erroneously indicted him, and that this Court has no jurisdiction over this cause. The Court refers to the above discussion of these arguments and finds that the transcripts are not pertinent to the Defendant's request to withdraw his plea and to dismiss this case. Additionally, as it relates to his request for a transcript of the grand jury proceedings, the Defendant has not presented a substantial showing of a "particularized need," which is required before the Court may override the secrecy that attaches to grand jury proceedings and order that grand jury materials be disclosed. *Illinois v. Abbott & Assoc., Inc.*, 460 U.S. 557 (1983).

The Defendant also requests that he be provided with a copy of the Court's order that authorized the removal of an exhibit that was attached to one of his filings. The Court reiterates its statement from a previous order that there are no missing docket entries or removed exhibits, and no Order of this Court to remove any exhibits. (Opinion and Order 5, DE 371). The Defendant's request for the nonexistent order cannot be granted.

**ORDER**

For the foregoing reasons, the Defendant's request to withdraw his plea of guilty, as set forth in docket entries 315, 328, 330, and 342 is DENIED. To the extent those motions request dismissal of this cause for lack of jurisdiction, that request is also DENIED. The Defendant's Motion to Produce Transcripts [DE 359] is DENIED.

The Defendant is scheduled for SENTENCING on Thursday, October 9, 2008, at 10:00 AM before Judge Theresa L. Springmann. The Court will rule on any objections to the Presentence Investigation Report that are set forth in the Addendum to the Report that was prepared on April 28 and revised on May 27, 2008. The Court will also give the Defendant and the Government an opportunity at the time of sentencing to address other factors that may affect the Defendant's sentence.

SO ORDERED on October 1, 2008.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT